**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JESSICA FRANKS,

      Plaintiff,

      12000 Market St., Apt. 284
      Reston, VA 20190

   v.

EDISON ELECTRIC INSTITUTE,

      Defendant.

      701 Pennsylvania Ave., N.W.
      Washington, DC 20004

      *Serve on:*

      Corporation Service Company
      1090 Vermont Ave., N.W.
      Washington, DC 20005

Civil Action No. 1:20-cv-3393_____

**COMPLAINT**

(Discrimination in Employment in Violation of
D.C. Human Rights Act, Title VII, and the Equal Pay Act)

    Plaintiff, Jessica Franks, sues Edison Electric Institute, Inc., Defendant, a professional association of investor-owned utility companies, incorporated in the Commonwealth of Virginia, and doing business in the District of Columbia, for discriminating against her based on her sex and race, for retaliating against her for reporting harassment and discriminatory hiring practices, and for pay inequity based on her sex and race.

1

Jurisdiction and Venue

1.      This Court has jurisdiction over the federal and state claims in this complaint

pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, and 42 U.S.C § 2000e-5(e)(5)(F)(3). This court

has jurisdiction over Plaintiff's Title VII claims pursuant to 42 U.S.C. § 2000e(b) and 42 U.S.C.

§ 2000e-5, and the Lilly Ledbetter Fair Pay Act of 2009, 42 U.S.C. § 2000e-5(e)(3)(A).

Equitable and other relief are also sought under 42 U.S.C. § 2000e-5(g).  This Court has

jurisdiction over Plaintiff's equal pay claims pursuant to the Equal Pay Act of 1963, 29 U.S.C.

§206(d)(1).  This Court has personal jurisdiction over Edison Electric Institute ("EEI"), Inc.,

pursuant to 28 U.S.C. § 1391 and D.C. Code Ann. §§ 13-334(a) and 13-423(a)(1).  This Court

has jurisdiction over Edison Electric Institute ("EEI"), Inc., because it is a corporation that is

authorized to conduct, and in fact does conduct, substantial business in the District of Columbia,

and because the allegations and claims for relief herein arise from Defendant's "transaction of

business" and "doing business" in the District of Columbia.

2.      Venue properly lies in this Court pursuant to 42 U.S.C § 2000e-5(e)(5)(F)(3) as

the unlawful practices alleged herein occurred in this district.  Venue is proper under 28 U.S.C. §

1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in the

District of Columbia.

Exhaustion of Administrative Remedies

3.      The primary acts of discrimination and retaliation at issue in this complaint

occurred between January 16, 2018 and October 31, 2019.  Plaintiff timely filed her charge of

discrimination with the U.S. Equal Employment Opportunity Commission on August 30, 2019,

and filed an amended charge of discrimination on January 24, 2020 after she was terminated. The complaint was cross-filed with the District of Columbia's Office of Human Rights on those same dates.

4.      On August 25, 2020, the EEOC sent Ms. Franks a copy of its Dismissal Closure Notice and Notice of Right to Sue.  Ms. Franks and her counsel received the notice on August 28, 2020.

5.      Plaintiff filed her notice of withdrawal of her complaint with the D.C. Office of Human Rights on Friday, October 30, 2020.

6.      Plaintiff's time in which to file a civil action under the D.C. Human Rights Act was tolled during the time in which it was pending before the EEOC and the D.C. Office of Human Rights.  Plaintiff has timely filed this civil action pursuant to D.C. Code § 2-1403.16, and within 90 days of when she received the Dismissal and Notice of Right to Sue from the EEOC.

Parties

7.      Plaintiff Jessica Franks is a citizen of the United States and a resident of the Commonwealth of Virginia.  At the time of the discrimination and harassment alleged in this complaint, she was employed by Edison Electric Institute, Inc., in Washington, D.C.

8.       Defendant Edison Electric Institute, Inc., is a professional membership association of investor-owned utility companies and a for-profit corporation headquartered in the Commonwealth of Virginia, with an office located in the District of Columbia, at 701 Pennsylvania Ave., N.W., Washington, D.C., 20004.  EEI is registered with the District of Columbia Department of Consumer and Regulatory Affairs.

9.     The registered agent for EEI is Corporation Service Company, located at 1090 Vermont Ave., N.W., Washington, D.C. 20005.

Factual Basis of the Complaint

10.     Ms. Franks is an African American female, a graduate of Wellesley College and Johns Hopkins University, and is currently attending the George Washington Law School.  Prior to joining EEI, Ms. Franks worked in Congress as a staffer for two Speakers of the House and worked as a lobbyist for a major energy services company. Ms. Franks also earned a Master's Degree from John's Hopkins University during that time.

11.     Defendant, EEI, has member electric utility companies that form its professional association membership. EEI's member utilities pay dues and other fees to EEI, as a trade association, to represent the utilities in lobbying efforts to Congress. EEI's member utilities also rely on EEI to obtain federal funds for them.

12.     On January 4, 2018, EEI offered Ms. Franks employment for the position of Director, Government Relations at an annual salary of $100,000.00.

13.     On January 16, 2018, Ms. Franks began work as Director, Government Relations for EEI, with a portfolio covering appropriations, budget, education, and workforce development.

14.      Ms. Franks was the only African American female director in her department and was also the first-ever African American female in that role.

15.      In her role as a Director of Government Relations, Ms. Franks was responsible for drafting congressional testimony.  She was the lobbyist responsible for EEI's policy work

with the Appropriations Committee and Education and Labor Committee.  She was also responsible for overseeing EEI's programs related to appropriations for the federal Low-Income Home Energy Assistance Program (LIHEAP), funds which EEI member companies received from the government.  Ms. Franks also represented EEI at national LIHEAP events and served as co-chair of an industry-wide 501(c)(3) organization's public policy committee.

16.     Ms. Franks's supervisor was Kathy Steckelberg, Vice President of Government Relations.  Ms. Steckelberg is a white female.  Ms. Franks was one of three Government Relations directors supervised by Ms. Steckelberg. The other two directors and the senior directors are white males.

17.     Throughout 2018, Ms. Franks received strong performance reviews from Ms. Steckelberg related to Ms. Franks's communication with EEI member companies and leadership on LIHEAP funding.

18.     On April 12, 2018, during a quarterly review, Ms. Steckelberg told Ms. Franks that due to her good performance she would receive a $10,000 raise.

19.     Ms. Franks also received an Exceeds Expectations rating in a first quarter performance review in April 2018.

20.     Ms. Franks received another good performance review at the end of 2018.

21.     Ms. Franks received another $1100 raise on January 23, 2019 after her quarterly performance review.

<u>Ms. Franks Reports Concerning Statistics On</u>
<u>Lack of Diversity and Employment Opportunities for African Americans</u>

22.     In the first quarter of 2019, Ms. Franks discussed workforce development goals

with a member company as part of her Director responsibilities. Specifically, on January 3, 2019,

Ms. Franks met with representatives from Duke Energy.  The representatives from Duke Energy

told Ms. Franks that workforce development and diversity and inclusion were part of their

priorities for the year, but that that EEI did not seem to have an interest in diversity and inclusion

issues.

23.     Ms. Franks shared the feedback she received about diversity from Duke Energy

with Ms. Steckelberg. Ms. Steckelberg told Ms. Franks to reach out to the Environmental, Social,

and Governance (ESG) team.

24.     The ESG team recommended that Ms. Franks join them in meeting with the Center

for Energy Workforce Development (CEWD), a non-profit organization under EEI's corporate

umbrella), to discuss a workforce development project.

25.     On January 31, 2019, Ms. Franks met with CEWD employees and three EEI

employees, including another male Director of Government Relations, to discuss statistics about

diversity and inclusion within EEI's member utilities. During the meeting, Ms. Franks learned

that while the diversity numbers for Duke Energy and a handful of other EEI members were very

good, the diversity numbers for most of the remaining EEI companies were not good,

particularly with respect to employment of Hispanics and African Americans.

26.     During the meeting, Ms. Franks was also shown a CEWD-generated draft report

that showed extremely poor diversity within EEI's member companies, particularly with respect

to employment of African Americans.  The report showed a breakdown of EEI member workforce diversity numbers by race and ethnicity.

27.     Ms. Franks was not allowed to take the CEWD report out of the room after the meeting.  Upon information and belief, the report was a bi-annual CEWD report from 2018 on the workforce data of EEI-member electric companies.

28.     On February 1, 2019, Ms. Franks informed Ms. Steckelberg of the statistics she viewed reflecting a tremendous disparity in employment opportunities for minorities in EEI member companies, especially for African Americans.  Ms. Franks also informed Ms. Steckelberg of the need for improvement of such numbers.

29.     At the time of this February 1, 2019 conversation with Ms. Steckelberg, Ms. Franks reasonably believed that she was opposing discriminatory practices by EEI and/or its members.  Ms. Franks knew, from her work lobbying Congress for LIHEAP appropriations funding, that federal appropriations and other laws prohibited discrimination in employment for corporate recipients of federal funding.

30.     In addition, EEI's members are, in essence, their customers. Ms. Franks was reporting that the customers she served, and who paid money to EEI to lobby Congress on their behalf for federal monies, were not serious about promoting diversity and inclusion in the workplace, and the lack of diversity in such companies showed discrimination in employment opportunities for African Americans. However, Ms. Steckelberg did not want to hear about these concerns.

Retaliation by Ms. Steckelberg

31.    In response to Ms. Franks's reports, Ms. Steckelberg became visually frustrated, telling Ms. Franks to "drop it," regarding the pursuit of stronger diversity amongst the EEI member companies.  Ms. Steckelberg also told Ms. Franks in sum and substance, that they all knew about the lack of diversity, that it was evident at board meetings, but the EEI member companies did not want to hear about efforts to change. She also told Ms. Franks to look around the room at board meetings and see there is no diversity.

32.    Ms. Steckelberg retaliated against Ms. Franks soon after Ms. Franks notified Ms. Steckelberg of the problems with EEI member's diversity statistics and the disparity in employment opportunities for African American employees.

33.    On February 4, 2019, EEI Chief Administrative Officer Mary Miller emailed a number of people, including the male EEI Government Relations Director, the head of the CEWD workforce development committee, the head of EEI HR, and Ms. Franks, stating that Ms. Miller was aware of their meeting where they discussed "statistics regarding the diversity of our membership."  In the email, Ms. Miller informed Ms. Franks and an African American male EEI Director, who had been at the meeting with Ms. Franks, that another EEI director, a white male, was also doing a "deep dive" into diversity statistics at the "C-suite level."

34.    Then, on February 15, 2019, Ms. Franks attended another diversity meeting with the CEWD employees and two other EEI employees, including the African American male Director and the white male employee referenced in Miller's earlier email.  The white male employee was the Senior Director of Member Service at the time, but when Ms. Franks was

first hired in January 2018, he was also a Director of Government Relations and handled the

LIHEAP appropriations issues prior to Ms. Franks's assumption of that responsibility.

35.    During the February 15, 2019 meeting, Ms. Steckelberg informed Ms. Franks that

Ms. Franks would no longer be working on the workforce development project with CEWD.

Instead, the white male Senior Director was given the responsibility of overseeing the

workforce development project and its examination of EEI diversity statistics. Ms. Steckelberg

and Ms. Miller made these decisions within two weeks of learning about Ms. Franks's reported

concerns about the disparate hiring of African Americans and other minorities in EEI member

companies.

36.    After removing Ms. Franks from the workforce development project, Ms.

Steckelberg began scrutinizing Ms. Franks's time and productivity, and retaliated against her by

questioning Ms. Franks's job performance.

37.    On April 25, 2019, Ms. Steckelberg came into Ms. Franks's office upset that Ms.

Franks had purportedly "almost" missed a deadline to submit testimony to Congress.  However,

Ms. Franks had not missed and did not miss this deadline.

<u>Retaliatory Performance Improvement Plan</u>

38.    In May 2019, Ms. Steckelberg asked Ms. Franks to provide a self-evaluation of her

performance for a mid-cycle performance review. Shortly thereafter, during the May 8, 2019

first quarter 2019 performance review, Ms. Steckelberg provided Ms. Franks with a memo

dated May 3, 2019, which she had apparently submitted to HR, documenting Ms. Franks's

alleged poor performance.  Ms. Steckelberg also handed Ms. Franks a Performance

Improvement Plan ("PIP") and gave Ms. Franks a list of tasks to complete during the PIP. Ms. Steckelberg required Ms. Franks to send weekly reports of Ms. Franks's progress on the PIP tasks.

39.    On May 10, 2019, Ms. Steckelberg notified Ms. Franks that she "was not showing the leadership and initiative that I expect."

40.    Ms. Steckelberg did not address any purported performance concerns about Ms. Franks, or place Ms. Franks on a PIP, until after Ms. Franks had raised concerns about diversity and inclusion for African Americans and other minorities in EEI's membership workforce. Prior to the PIP, Ms. Steckelberg had issued no performance warnings to Ms. Franks and in fact had rewarded her good performance with salary increases.

41.    The two-page PIP memo was riddled with inaccuracies about Ms. Franks's job performance and duties. In addition, there was no citation to any EEI policy, relevant objective EEI standards and/or expectations for the position that Ms. Franks had failed to follow during the performance period. The memo also did not include any plan for professional re-training or additional support to Ms. Franks to improve her performance.

42.    Instead, the memo rattled off random grievances that Ms. Steckelberg had never previously mentioned. One of Ms. Steckelberg's grievances concerned the purported "key deadline" Ms. Franks "would have" missed, but which she did not.

43.    The PIP memo also alleged that Ms. Franks failed to take ownership of work on other issues outside the LIHEAP (Low-Income Housing Energy Assistance Program) coalition project. However, Ms. Franks helped with the diversity workforce project, until that responsibility was taken away by Ms. Steckelberg in February 2019.

10

44.     In addition, as the first black female Director of Government Relations for EEI, Ms. Franks had also secured a $62 million increase in federal appropriations for LIHEAP, bringing it to its highest level in ten years.

45.     Ms. Franks was also co-lead of the Linework Appreciation Day event and Resolution, which Ms. Steckelberg acknowledges was a success. For the Linework event, Ms. Franks set records at EEI by increasing Congressional resolution signatories from 27 to 107 signatures.  However, the other co-lead for that event was a white male, who was given a title change and additional responsibilities after the event. Thus, even when Ms. Franks attempted to take the lead on and ownership over other projects, Ms. Steckelberg either removed Ms. Franks from the projects or diminished her contributions and rewarded white males instead.

46.     In addition, during the PIP, a LIHEAP organization called NEUAC asked Ms. Franks to represent the Washington Reps, an EEI client, on C-SPAN, rather than her other Government Relations colleagues. This was one of the successes Ms. Franks noted on her PIP response memo. *See* C-SPAN coverage at: https://www.c-span.org/video/?460895-1/energy-access-affordability.

47.     Yet, Ms. Steckelberg later claimed the Washington Reps had sent "complaints" about Ms. Franks during the PIP, which made no sense given her success representing them on C-SPAN.

48.     Nonetheless, Ms. Franks completed each of the PIP tasks assigned to her by July 2019, as instructed by Ms. Steckelberg. Ms. Franks ensured that she completed every task and achieved successes (i.e., obtaining the most LIHEAP funding, the most Linework resolution signatures, and representing the company on C-Span) during her PIP.

49.     From May 10, 2019 to June 28, 2019, pursuant to the PIP requirements, Ms. Franks sent eight weekly reports to Ms. Steckelberg by email. Ms. Steckelberg never responded to any of these emails, nor did Ms. Steckelberg provide Ms. Franks with any feedback on her PIP progress.  Instead, during the PIP period Ms. Steckelberg avoided and isolated Ms. Franks. She refused to speak to Ms. Franks and only addressed Ms. Franks by name when required to do so in staff meetings.

50.     Despite Ms. Franks's completion of all tasks assigned under the PIP, including providing Ms. Steckelberg with weekly reports highlighting her completion of these tasks, Ms. Steckelberg neither responded to any of Ms. Franks's communications, nor held the final PIP review meeting on July 4, 2019, as she had promised Ms. Franks.

51.     Ms. Steckelberg was supposed to meet with Ms. Franks to review her performance on the PIP, but never did. Ms. Steckelberg also missed the July 4, 2019 deadline to provide Ms. Franks with feedback on her performance under the PIP.

52.     Meanwhile, on July 15, 2019, the National Energy & Utility Affordability Coalition (NEUAC), made up of EEI member companies, selected Ms. Franks to be chair of their Public Policy & Advocacy Committee. However, Ms. Steckelberg told Ms. Franks to turn it down. Ultimately, Ms. Steckelberg only agreed that Ms. Franks could be a co-chair if the American Gas Association also served as co-chair.

53.     On July 22, 2019, Ms. Franks corresponded with Ms. Steckelberg's assistant to ask whether her performance review could be completed by August 1, 2019, before Ms. Franks was set to go on leave for her August 2, 2019 wedding.  Ms. Steckelberg was aware that Ms. Franks would be out of the office for a work trip and then would be going on her honeymoon August 2-

15, 2019.  However, Ms. Franks received no response to her request for a date for her
performance review before she went on leave.

Retaliatory and Unlawful Termination

54.     After Ms. Franks returned from her honeymoon, she was called into a meeting on
August 27, 2019, which she believed would be her belated performance review.  Ms. Franks
prepared a document to provide to Ms. Steckelberg showing her completion of the PIP items.

55.     Instead of reviewing Ms. Franks's PIP performance, Ms. Steckelberg led Ms.
Franks into the office of the head of human resources, Terri Oliva. Ms. Steckelberg then told
Ms. Franks, in these words, "you're not a good fit." She then handed Ms. Franks a separation
agreement and requested that Ms. Franks voluntarily resign by October 31, 2019, or she would
be terminated. Ms. Franks was given until September 16, 2019, to agree to the resignation and
sign the separation agreement.

56.     Ms. Steckelberg also gave Ms. Franks a two-page memo dated August 22, 2019,
complaining about Ms. Franks' performance without any reference to the specific tasks in the
PIP or Ms. Franks's accomplishment of those tasks.  In the memo, Ms. Steckelberg made vague
references to Ms. Franks not meeting deadlines, although in fact Ms. Franks had met all of her
PIP deadlines.

57.     Ms. Steckelberg also referenced alleged tasks that were never mentioned as issues
in the May 2019 PIP, including writing "bullets" for EEI's quarterly value report.  This is
something Ms. Franks was never previously required to do and was not told was important to
Ms. Steckelberg.  Even so, this allegation was untrue as Ms. Franks regularly communicated

13

with the Communications Department to update EEI members via a website dedicated to LIHEAP issues.

58.    After Ms. Steckelberg gave Ms. Franks the proposed separation agreement, she left the meeting. Ms. Franks started to cry.  The head of HR asked Ms. Franks if she thought Ms. Steckelberg was being fair, but Ms. Franks didn't respond. Ms. Franks gave the PIP documents to Ms. Oliva, telling HR that Ms. Steckelberg never said anything about them, and left. Ms. Oliva told Ms. Franks to take the rest of the day off.

59.    Ms. Franks did not sign the separation agreement.  Instead, on August 31, 2019, Ms. Franks filed a charge of discrimination with the EEOC, alleging race, sex, and reprisal discrimination and harassment. Ms. Franks provided copies of her complaint to EEI HR and Ms. Steckelberg. That was the last time Ms. Steckelberg spoke to Ms. Franks.

60.    As a result of Ms. Franks's refusal to acquiesce to EEI's demands that she "voluntarily resign," and in retaliation for filing of her EEOC charge, EEI took action against her by rescinding the offer of voluntary resignation and demanding repayment of tuition reimbursements Ms. Franks had received as part of EEI's workplace benefits.

61.    On September 13, 2019, EEI informed Ms. Franks by email that her termination would be effective October 31, 2019.  EEI's representative stated in the email, "Ms. Franks does not have the option to revive or continue her employment by choosing not to sign the agreement or by claiming she is 'not resigning.'"

62.    Then, on September 19, 2019, EEI sent Ms. Franks a separation benefits statement which demanded reimbursement of tuition payments. However, this was not in compliance with EEI's policy concerning tuition reimbursement.  In fact, EEI policy stated that employees who

14

do not leave voluntarily do not have to reimburse EEI. Ms. Franks did not sign the voluntary resignation and separation agreement, and was flatly told that the separation offer had been rescinded on September 13, 2019. Therefore, under EEI's own policies, Ms. Franks was not required to return the tuition payments. Threatening her with this alleged debt is further retaliation for her protected activity.

63.     On October 18, 2019, Ms. Franks's entire department had a meeting with the member companies. Ms. Franks was not invited to the meeting.

64.     On October 24, 2019, Ms. Franks provided a narrative of her discrimination and retaliation claims to EEI's President Tom Kuhn and EVP Brian Wolff.  Mr. Kuhn responded that Ms. Franks was "extorting him," and that Ms. Franks could share her information with the government if she wanted but that EEI did not intend to take any action on her allegations.

65.     At Mr. Kuhn's suggestion, Ms. Franks contacted Representative Rosa DeLauro's office on or about October 29, 2019 to report her concerns that EEI and its members may be violating federal fair hiring laws in their disparate treatment of Blacks and Hispanics while receiving federal LIHEAP appropriations.

66.     Ms. Franks continued to attend congressional meetings as part of her job duties in October 2019.  However, on October 30, 2019, Ms. Steckelberg took away a congressional fundraiser project from Ms. Franks.

67.     EEI officially terminated Ms. Franks from her employment on October 31, 2019.

68.     In July 2020, Ms. Franks submitted a follow-up request to Rep. DeLauro's office to inform the congresswoman that EEI terminated Ms. Franks after Ms. Franks reported to EEI

supervisors that she had concerns about disparate hiring practices for African Americans and other minorities among EEI's member companies.

69.    In September 2020, Rep. DeLauro initiated a Congressional request to the U.S. Department of Health and Human Services, Inspector General's Office, with a copy to the Department of Labor and Department of Justice, concerning HHS grantees of LIHEAP appropriations who engaged in disparate employment and hiring practices towards minorities.

<u>Discrimination in Pay</u>

70.    During Ms. Franks's employment with EEI, EEI paid Ms. Franks less than at least one white male co-worker.  This male had the same title, Director, as did Ms. Franks.  But he had less education and did not have Master's Degrees like Ms. Franks.

71.    Specifically, EEI paid Ms. Franks significantly less than her white male colleague, EEI Director of Government Relations, Patrick Arness.  Mr. Arness held the same level of Director as Ms. Franks, and held the same employment responsibilities as Ms. Franks.  For example, both Ms. Franks and Mr. Arness drafted congressional testimony and information sheets; both lobbied Congressional committees on behalf of EEI members; both attended fundraisers; both met with Members of Congress and their staff; both worked with consultants and EEI members; and both worked in the same department for the same supervisor. Mr. Arness was also hired at approximately the same time as Ms. Franks.

72.    However, while Ms. Franks was the sole Director responsible for handling the Appropriations Committee and Education and Labor Committee work for EEI, including obtaining federal funding for EEI members, Mr. Arness shared responsibilities with two other

male directors for his work on the Energy and Commerce Committee.  Ms. Franks was also the

only director who represented EEI at national LIHEAP events and served as co-chair of an

industry-wide 501(c)(3)'s public policy committee. Despite these additional responsibilities and

experiences, EEI paid Ms. Franks significantly less than Mr. Arness.

73.    In addition, although Mr. Arness does not hold a Master's Degree, Ms. Franks,

who does have a Master's Degree, was paid significantly less than Mr. Arness for the same work

and under the same working conditions due to her race and sex.  Ms. Franks had at least the same

amount of experience as Mr. Arness, including her substantial lobbying experience with

Halliburton prior to joining EEI, and service as a staffer in Congress for two House Speakers.

Ms. Franks's job announcement required a minimum of five years of such experience, which she

had, in addition to a Bachelor's Degree, while Ms. Franks also had a Master's Degree.

74.    In addition, Mr. Arness was hired by EEI approximately one month prior to Ms.

Franks.

75.    The salary range for the position of Director, Government Relations at EEI is

approximately $185,000.00 to $200,000.00 annually, rather than the $100,000 base salary Ms.

Franks initially received.

76.     As a result of the aforementioned race and sex discrimination, hostile

work environment harassment, and reprisal, Plaintiff has experienced significant emotional

distress, pain, suffering, mental anguish, economic loss, loss to her professional reputation, and

damage to her family relationships.

77.     Plaintiff has lost pay, promotional opportunities, and various benefits of

employment due to Defendant's actions.

78.     Defendant caused Plaintiff to experience unfair and discriminatory disciplinary actions, including an unjustified Performance Improvement Plan and an unlawful termination.

## **VIOLATIONS OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**

### Count One

(Hostile Working Environment Harassment – Sex, Race, and Reprisal – DCHRA)

79.     The foregoing paragraphs are realleged and incorporated by reference.

80.     Defendant's conduct as alleged herein constitutes sex and race discrimination and harassment, and retaliation, in violation of the D.C. Human Rights Act, §§ 2-1401, 1402, *et seq*.

81.     Defendant created and perpetuated a hostile work environment for Plaintiff wholly and/or partially based upon her sex, race, and/or protected EEO activities, and refused to remedy that hostile work environment even when it was directly and repeatedly reported by the Plaintiff to Defendant.

82.     After Plaintiff reported the harassment and discrimination alleged above, engaging in protected activity under the D.C. Human Rights Act, Defendant also subjected Plaintiff to a retaliatory hostile work environment which affected the terms and conditions of her employment.

83.     Defendant retaliated against Plaintiff after she reported the discrimination by harassing her based wholly or partially on her prior protected activity.

84. The hostile work environment involved acts by Plaintiff's supervisor, including low performance evaluations, a performance improvement plan, removal of job opportunities and assignments, rewarding other employees for Plaintiff's work, loss of pay and promotional opportunities, time and attendance scrutiny, and ultimately culminated in tangible employment actions including termination of Plaintiff's employment with Defendant.

85. Defendant unlawfully and seriously harassed Plaintiff wholly or partially on the basis of her sex, race, and/or retaliation. The harassment was so objectively offensive, severe and/or pervasive that it altered the conditions of Plaintiff's employment.

86. Defendant failed to exercise reasonable care to prevent and correct the hostile working environment, and conducted no investigation into her allegations of harassment.

87. The hostile work environment led to Plaintiff's termination from her employment with Defendant.

Count Two

(Disparate Treatment in Pay – Sex and Race Discrimination – DCHRA)

88. The foregoing paragraphs are realleged and incorporated by reference.

89. Defendant's conduct as alleged herein constitutes sex and race discrimination in violation of the D.C. Human Rights Act, §§ 2-1401 and 1402, *et seq*.

90. Defendant discriminated against Plaintiff with respect to pay decisions wholly or partially based upon Plaintiff's sex and/or race.

91. By intentionally providing Plaintiff with a lower salary than white and male employees in the same position, in the same department, conducting substantially similar work,

19

and by denying her meritorious bonuses or salary increases, and raises given to male employees, Defendant intentionally acted to deprive Plaintiff of equal pay and other opportunities.

92.     Defendant had no legitimate reason for denying Plaintiff equal pay to those of her white and male colleagues. The true reason for the failure to pay Plaintiff equally to her white and male peers was wholly or partially based upon race and/or sex.


<u>Count Three</u>

(Unlawful Termination of Employment – Sex, Race, Reprisal - DCHRA)

93.     The foregoing paragraphs are realleged and incorporated by reference.

94.     Defendant's conduct as alleged herein constitutes discrimination on the basis of sex, race, and/or reprisal in violation of the D.C. Human Rights Act, §§ 2-1401 and 1402, *et seq.*

95. Defendant's termination of Plaintiff's employment, was wholly or partially based upon her race, sex, and/or protected EEO activity.


**<u>VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964</u>**

<u>Count Four</u>

(Hostile Work Environment Harassment –Race, Sex, and/or Retaliation —Title VII)

96.     The foregoing paragraphs are realleged and incorporated by reference.

97.     Defendant's conduct as alleged herein constitutes race and/or sex discrimination, and/or retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e and 42 U.S.C. § 2000e-3.

98.     Defendant created and perpetuated a hostile work environment for

Plaintiff because of her race, sex, and/or her protected EEO activities, and refused to remedy that

hostile work environment even when it was directly and repeatedly reported by the Plaintiff to

Defendant.

99.     After Plaintiff reported the harassment and discrimination alleged above,

engaging in protected activity under the Civil Rights Act of 1964, as amended, Defendant

retaliated against her in the terms and conditions of her employment.

100.    Defendant retaliated against Plaintiff after she reported the discrimination by

subjecting her to a hostile working environment and harassing her.

101.    The hostile work environment involved acts by Plaintiff's supervisor,

including low performance evaluations, a performance improvement plan, removal of job

opportunities and assignments, rewarding other employees for Plaintiff's work, loss of pay and

promotional opportunities, time and attendance scrutiny, and ultimately culminated in tangible

employment actions including termination of Plaintiff's employment with Defendant.

102.    Defendant unlawfully harassed Plaintiff on the basis of her race,

sex, and/or protected EEO activity.

103.    The harassment was so objectively offensive, severe and/or pervasive that it

altered the conditions of Plaintiff's employment.

104.    Defendant failed to exercise reasonable care to prevent and correct the

hostile working environment, and conducted no investigation into Plaintiff's allegations of

hostile work environment harassment.

<u>Count Five</u>

(Disparate Treatment in Pay – Sex and Race Discrimination – Title VII)

105.    The foregoing paragraphs are realleged and incorporated by reference.

106.    Defendant's conduct as alleged herein constitutes sex and race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended by the Lilly Ledbetter Fair Pay Act of 2009, 42 U.S.C. § 2000e-5(e)(3)(A).

107.    Defendant's actions in providing Plaintiff with a lower salary and compensation than non-African American and/or male employees, including denying her meritorious bonuses and/or salary raises given to non-African American and/or male employees during this time, were not made free from any discrimination based on her race or sex.

108.    By intentionally providing Plaintiff with a lower salary and compensation than non-African American and/or male employees, Defendant intentionally acted to deprive Plaintiff of equitable pay opportunities to which she was entitled.

109.    Defendant had no legitimate reason for failing to pay Plaintiff the same as her non-African American and/or male colleagues. The true reason for these actions was because of discrimination on the basis of race and/or sex.

110.    For each paycheck Ms. Franks received from January 16, 2018 to October 31, 2019, where she was compensated less than male EEI Director of Government Relations employees conducting equal work of substantially equal skill, effort and responsibility, as outlined above, Ms. Franks was provided unequal pay in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e-5(e)(3)(A).

22

<u>Count Six</u>

(Unlawful Termination – Race, Sex, Retaliation – Title VII)

111.    The foregoing paragraphs are realleged and incorporated by reference.

112.    Defendant's conduct as alleged herein constitutes race and/or sex discrimination, and/or reprisal in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e and §2000e-3(a).

113.    Defendant's termination of Plaintiff's employment, was because of discrimination on the basis of Plaintiff's race, sex, and/or protected EEO activity.

## **VIOLATIONS OF THE EQUAL PAY ACT**

<u>Count Seven</u>

(Unequal Pay for Equal Work – Sex Discrimination – Equal Pay Act)

114.    The foregoing paragraphs are realleged and incorporated by reference.

115.    Defendant's conduct as alleged herein constitutes sex discrimination in violation of the Equal Pay Act of 1963, 29 U.S.C. §206(d)(1).

116.    Defendant's actions in providing Plaintiff with unequal salary and compensation than male employees conducting equal work, of substantially equal skill, effort and responsibility, and under similar working conditions, during her employment with Defendant, including denying her meritorious bonuses and/or salary raises given to male employees working in such similar working conditions during this time, were not made free from any discrimination based on her sex.

117.    By providing Plaintiff with a lower, and thus unequal, salary and compensation than male employees conducting substantially equal work, in similar working

23

conditions, in the same job title, working in the same department and under the same supervisor, Defendant deprived Plaintiff of equitable pay opportunities to which she was entitled for conducting equal work of substantially equal skill, effort and responsibility.

118. For each paycheck Ms. Franks received from January 16, 2018 to October 31, 2019, where she was compensated less than male EEI Director of Government Relations employees conducting equal work of substantially equal skill, effort and responsibility, as outlined above, Ms. Franks was provided unequal pay in violation of the Equal Pay Act, as amended.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff requests that the Court award her:

1) compensatory damages in an amount sufficient to compensate for the pecuniary and non-pecuniary injuries she has suffered as a result of the allegations listed above, such as but not limited to, emotional distress and pain and suffering;

2) punitive damages and penalties to the maximum extent allowed by law;

3) back pay for Defendant's termination of Plaintiff's employment;

4) reinstatement, or, in the alternative, front pay;

4) lost wages and pay;

5) medical expenses;

6) costs and reasonable attorneys' fees incurred in connection with this lawsuit and the underlying administrative proceedings; and

7) such other damages and relief as is deemed just.

## **JURY DEMAND**

Plaintiff requests a trial by jury.


_____//S//_____
Cathy A. Harris, D.C. Bar No. 467206
Juliette Niehuss, D.C. Bar No. 977316
KATOR, PARKS, WEISER & HARRIS
1200 18th Street, N.W., Suite 1000
Washington, D.C.  20036
(202) 898-4800
Fax: (202) 289-1389
Emails: charris@katorparks.com
       jniehuss@katorparks.com

Attorneys for Plaintiff

Date: November 23, 2020