UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JESSICA FRANKS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>EDISON ELECTRIC INSTITUTE, )<br>)<br>Defendant. )<br>) | Case No. 20-cv-3393 (APM) |

**MEMORANDUM OPINION AND ORDER**

**I.**

Plaintiff Jessica Franks brings this action against her former employer, Defendant Edison Electric Institute ("EEI"), advancing claims of a hostile work environment, unequal pay, and discriminatory termination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402 *et seq*. Plaintiff contends that each of EEI's challenged actions was taken because of her race or sex, or in retaliation for protected activity. Plaintiff Franks also brings a separate claim under the Equal Pay Act, 29 U.S.C. § 206(d).

Defendant now moves for summary judgment as to all claims. Def.'s Mot. for Summ. J., ECF No. 16 [hereinafter Def.'s Mot.], Def.'s Mem of P. & A. in Supp. of Def.'s Mot. [hereinafter Def.'s Mem].[1] For the reasons that follow, the court grants in part and denies in part Defendant's motion for summary judgment. Specifically, the court grants Defendant's motion as to all claims except those asserting that EEI terminated Plaintiff based on her race.

---

[1] Defendant filed its motion, statement of facts, and memorandum in a single PDF at ECF No. 16. The court will cite each document within that filing separately.

## II.

The court analyzes the parties' motions under the familiar standards for summary judgment under Rule 56 and the principles governing Title VII claims for hostile work environment, disparate pay, and retaliation. Also, it is settled that Title VII's standards and federal antidiscrimination jurisprudence customarily apply to DCHRA claims. *See Kumar v. D.C. Water & Sewer Auth.*, 25 A.3d 9, 16–17. (D.C. 2011). The court will address each claim under the applicable federal standard and draw distinctions to the DCHRA if necessary. Because the court writes primarily for the parties, it does not recite the record facts here but refers to them as needed in its analysis.

Before turning to that analysis, the court must first address two misstatements of law made by Plaintiff. First, she argues that the causation requirement for disparate treatment claims under the DCHRA are "even more liberal" than under Title VII. Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot., ECF No. 21 [hereinafter Pl.'s Opp'n], at 18. That is not correct. Just as a Title VII disparate treatment claim requires a showing that discriminatory animus was, at least, a "motivating factor" for the adverse action, *see Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019), so too does the DCHRA, *see Little v. D.C. Water & Sewer Auth.*, 91 A.3d 1020, 1025 (D.C. 2014). In addition, Plaintiff argues that "[r]etaliatory hostile work environment claims are considered under a different and less onerous standard than applicable to other bases of discrimination." Pl.'s Mem. at 18. That too is not correct. In this Circuit, the severity and pervasiveness requirements for a hostile work environment claim based on race or sex apply equally to a retaliatory hostile work environment claim. *See Baird v. Gotbaum*, 792 F.3d 166, 168–69 (D.C. Cir. 2015).

A.

With those legal principles clarified, the court begins with Plaintiff's claim that she was subjected to a hostile work environment based on race, sex, and retaliation. To prevail on a hostile work environment claim, a plaintiff must show that she was subjected to "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). The events constituting a claim for hostile work environment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Cf. Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n.1 (1998) (internal quotation marks omitted) (quoting with approval decisions by courts of appeals). The DCHRA follows the federal standard. *See Barrett v. Covington & Burling*, 979 A.2d 1239, 1245 (D.C. 2009). In all, courts use a "totality of the circumstances" test to assess a hostile work environment claim. *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008). Possible factors are "the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.* Assessing severity and pervasiveness can involve an inquiry into whether the alleged conduct "is physically threatening or humiliating, or a mere offensive utterance," as well as "[t]he effect on the employee's psychological well-being." *Harris*, 510 U.S. at 23. Plaintiff's proffered facts, viewed in the light most favorable to her, fall well short of establishing a hostile work environment on any basis.

Plaintiff's hostile work environment claims are all rooted in Plaintiff's relationship with her supervisor, Kathy Steckelberg, and the actions Steckelberg took against her. Franks points to, for example, Steckelberg's removing her from a project in favor of a white colleague and giving

her progressively less favorable reviews and ratings. But poor performance reviews and being removed from assignments do not generally constitute sufficient facts for a hostile work environment claim to survive summary judgment. *See Baloch*, 550 F.3d at 1195, 1201 (affirming summary judgment where the plaintiff faced numerous disciplinary infractions, including suspension and poor reviews). Plaintiff also complains about Steckelberg's increasing criticism and scrutiny of her performance over the course of the spring and summer of 2019, including a harsh exchange in which Steckelberg yelled at Plaintiff for not alerting her to an impending deadline for draft congressional testimony. Pl.'s Opp'n, Pl.'s Resps. to Def.'s Stmt. of Facts, ECF No. 21-2 [hereinafter Pl.'s SOF], ¶¶ 86–88. Similar complaints have been rejected as rising to the level of a hostile work environment. *See Baloch*, 550 F.3d at 1195, 1999 (finding no hostile work environment with repeated yelling and threats of arrest); *Gray v. Foxx*, 637 F. App'x 603, 605, 608 (D.C. Cir. 2015) (finding that yelling and screaming is not enough for a hostile work environment); *Tillman v. Barr*, No. 17-cv-475 (APM), 2019 WL 2550736, at *5 (D.D.C. June 20, 2019) (finding no hostile work environment even with aggressive yelling).

Tellingly, Plaintiff says the "the most hostile" treatment she received was Steckelberg's silent treatment *after* EEI had given notice of its intent to terminate her employment. Notice of Filing Exs., ECF No. 17 [hereinafter Exhibit Notice], Ex. 3, Jessica Franks Dep. Tr. Excerpts, ECF No. 17-4 [hereinafter Franks Dep.], at 314. But Plaintiff cites no case to support an argument that post-termination awkwardness—particularly when Plaintiff, soon after receiving EEI's termination notice, had retained counsel to advance her discrimination claims—constitutes anything other than "less-than-ideal working conditions." *Tobey v. U.S. Gen. Servs. Admin.*, 480 F. Supp. 3d 155, 172 (D.D.C. 2020) (internal quotation marks omitted). In sum, Plaintiff's hostile work environment claims cannot escape summary judgment in Defendant's favor.

4

B.

Turning to Plaintiff's retaliation claims, the court finds that each fails (including her retaliatory hostile work environment claim) because Plaintiff did not engage in any protected activity. "Whether actions by an employee constitute protected activity is a question of law." *Ukwuani v. District of Columbia*, 241 A.3d 529, 546 (D.C. 2020) (internal quotation marks omitted); *see also Barnes v. Small*, 840 F.2d 972, 976 (D.C. Cir. 1988). Plaintiff here invokes Title VII's so-called "opposition" clause. Pl.'s Mem. at 18–19; 42 U.S.C. § 2000e-3(a) (prohibiting retaliation against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter"); *see also* D.C. Code § 2-1402.61 (prohibiting retaliation against a "person [who] has opposed any practice made unlawful by this chapter"). Title VII requires that "an employee seeking the protection of the opposition clause demonstrate a good faith, reasonable belief that the challenged [employment] practice violates" the statute. *Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981). So, too, does the DCHRA. *Ukwuani*, 241 A.3d at 546.

Plaintiff's claimed protected activity here is that, on February 1, 2019, she allegedly told Steckelberg that she "had seen EEI member company statistics that showed a . . . lack of diversity particularly in the hiring of African Americans and Latinos," and that something "must be wrong" for the statistics to be so poor. *See* Pl.'s SOF ¶¶ 133–134.

No person, however, could reasonably believe that Plaintiff's conversation with Steckelberg constituted protected opposition activity for two reasons. First, as relevant here, Title VII's and the DCHRA's prohibitions apply only to "an employer." 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer [to engage in proscribed practices] . . . ."); *see also* D.C. Code § 2-1402.11(a)(1)(A). Plaintiff did not raise concerns about

5

an "employer." Rather, she complained to Steckelberg about the lack of diversity among EEI's client organizations as a whole. Second, Plaintiff did not oppose any "practice." At most, she intimated that there might be *some* invidious reason for the absence of diversity within EEI's member companies. Speculation that something "wrong" may be the reason for the poor diversity statistics does not target an "employment practice" made unlawful by Title VII or the DCHRA. In sum, no person could reasonably believe that Plaintiff's general, undifferentiated criticism about the lack of employee diversity among EEI's member companies was protected opposition conduct.[2]

## C.

Next up are Plaintiff's disparate pay claims. The court addresses her Equal Pay Act claim first and then her Title VII/DCHRA claims.

### 1.

Under the Equal Pay Act, a plaintiff must first make a prima facie case of equal work. *Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO*, 712 F.2d 1488, 1491 (D.C. Cir. 1983). "To establish a prima facie case under the Act, a plaintiff must show that an employer pays different wages to employees of opposite sexes for 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Id.* (quoting 29 U.S.C. § 206(d)(1) (1976)). After a plaintiff has successfully made out a prima facie case, the employer can avoid liability by "pleading and proving one of . . . four

---

[2] The court notes that Plaintiff's contention that she said to Steckelberg that something "must be wrong" appears for the first time in her affidavit in opposition to Defendant's summary judgment motion. *See* Pl.'s Opp'n, Ex. 5, ECF No. 21-5, ¶ 40. It appears in neither her EEO charge nor her deposition. *See* Pl.'s Opp'n, Ex. 47, ECF No. 21-41, at 5, 8; *id.*, Ex. 2, Pl.'s Tr. of Dep. of Jessica Franks, ECF No. 21-3, at 193 (testifying as a "hypothetical" that "it [would] look[] like there's something wrong" if employment numbers did not mirror workforce populations). Thus, the court is skeptical that she ever uttered those words, but it has nevertheless viewed the evidence in the light most favorable to Plaintiff as it must at this stage.

affirmative defenses." *Id.*  The defenses allow pay disparities "made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Id.* at 1491–92 (internal quotation marks omitted).  If an employer rebuts the prima facie case with legitimate, nondiscriminatory reasons for the unequal pay, a plaintiff may counter such affirmative defense "by producing evidence that the defendant seeks to advance are actually a pretext for . . . discrimination." *Belfi v. Prendergast*, 191 F.3d 129, 136 (2d Cir. 1999); *accord Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1076 (9th Cir. 1999); *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 800 (6th Cir. 1998); *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995).  Here, no reasonable jury could find Plaintiff to have established a prima facie case or to have come forward with evidence of pretext to overcome EEI's affirmative defense.

To make out her prima facie case, Plaintiff relies on a comparison of her starting salary to that of a male employee, Patrick Arness.  EEI hired Arness just a month prior to Plaintiff.  Def.'s Mot., Def.'s Stmt. of Material Facts as to Which There Is No Genuine Dispute [hereinafter Def.'s SOF], ¶ 31.  Both held the title of Director for Government Relations.  *See id.*  Their job responsibilities involved lobbying members of Congress on behalf of EEI's member institutions and related duties, such as attending fundraisers, writing reports and testimony, and advising stakeholders.  *See* Pl.'s SOF ¶ 32.  Plaintiff concedes, however, that Arness's portfolio included energy policy and direct lobbying of the congressional committee—the Energy and Commerce Committee—most important to EEI.  *Id.* ¶¶ 32–34.  Arness received a starting salary $50,000 higher than Plaintiff.  *See id.* ¶ 39.

To be sure, there are similarities between Plaintiff's and Arness's work, but not enough to establish a prima facie case.  The Equal Pay Act does not require work to be identical between a

7

plaintiff and a comparator—or even comparable. The standard is "'substantial equality'—whether the jobs in question are substantially related and substantially similar in skill, effort, responsibility and working conditions." *Goodrich*, 712 F.2d at 1492. Even under this less stringent standard, Plaintiff's and Arness's work was not "substantially similar" in terms of the skill set required to perform the work. Arness's lobbying portfolio required specialized knowledge and experience in federal energy policy and legislation; Plaintiff's portfolio did not. Arness's background qualified him to perform the work that his position demanded; Plaintiff was not qualified to do Arness's work. Arness's immediate prior experience focused heavily on the legislative process relating to national energy policy. Def.'s SOF ¶ 34. For the five years prior to joining EEI, Arness worked as the legislative director for Congressman Jerry McNerney, a member of the House Energy and Commerce Committee and its Energy and Power Subcommittee. Def.'s SOF ¶ 33; Exhibit Notice, Ex. 11, Patrick Arness Dep. Tr. Excerpts, ECF No. 17-12 [hereinafter Arness Dep.], at 20–21, 27; Sealed Consent Mot. for Leave to File Docs Under Seal, ECF No. 20 [hereinafter Pl.'s Sealed Exs.], Ex. 16, ECF 20-5, at 5. This was the committee most important to EEI's members. *See* Pl.'s Opp'n, Ex. 11, Dep. of Kathryn Steckelberg, ECF No. 21-9 [hereinafter Steckelberg Dep.], at 24 (noting the importance of the House Energy and Commerce Committee, specifically). When he was McNerney's legislative director, Arness was directly lobbied on energy policy, including by EEI. Arness Dep. at 35–38 (mentioning knowing Steckelberg from lobbying and her involvement in his recruitment). In comparison, Plaintiff's prior Hill experience was shorter; at lower-level positions; and not policy-focused, let alone energy-policy focused. *See* Steckelberg Dep. at 24, 37 (comparing the Hill experiences of Arness and Franks). She was a registered lobbyist for Halliburton, but the extent of her work on energy policy in that position was at best

8

modest.  *See* Franks Dep. at 86–88 (speaking to her experience lobbying for Halliburton).[3]  Compared to Arness, Plaintiff therefore simply did not have "substantially similar" skills with respect to energy policy and the legislative process to make out a prima facie case that they performed equal work.

Even if Plaintiff had established a prima facie case, she offers no evidence to support an inference of pretext for sex discrimination.  "The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has used the [non-discriminatory] factor reasonably in light of the employer's stated purpose as well as its other practices."  *Belfi*, 191 F.3d at 136 (internal quotation marks omitted).  Here, Plaintiff relies on the exact same evidence to establish pretext as she does to make out her prima facie case.  Pl.'s Opp'n at 35–37.  She has come forward with no additional evidence that would create a genuine dispute of material fact that EEI did not reasonably and honestly believe that its proffered explanation for Arness's higher starting salary— his superior Hill experience and his subject-matter expertise on energy policy and legislation—to be the true reason for the pay disparity.  *See DeJesus v. WP Co.*, 841 F.3d 527, 535 (D.C. Cir. 2016) (observing that "the factfinder is tasked with evaluating the reasonableness of the decisionmaker's *belief* because honesty and reasonableness are linked: a belief may be so unreasonable that a factfinder could suspect it was not honestly held").  Judgment therefore is entered in favor of EEI on Plaintiff's Equal Pay Act claim.

## 2.

For similar reasons, Plaintiff's disparate pay claims based on race and sex under Title VII and the DCHRA fail.  For these claims, Plaintiff identifies more comparators than just Arness.

---

[3] Plaintiff makes much of the fact that, unlike her, Arness was not a registered lobbyist.  *See* Pl.'s Opp'n at 6, 31.  But Plaintiff offers no evidence that registration as a lobbyist was an important experiential factor for EEI.

Case 1:20-cv-03393-APM   Document 24   Filed 03/31/22   Page 10 of 15

She also identifies Seth Levey, a white man, hired the same month as Plaintiff, and Jennifer Jura, a white woman, hired approximately eight months after Plaintiff. Pl.'s Opp'n at 32 (citing Pl.'s Sealed Exs., Ex. 15, ECF No. 20-4, at 2; Pl.'s Sealed Exs., Ex. 16, ECF No. 20-5, at 13–21). Both started at higher salaries than Plaintiff. In addition, she points to Allison Bury, Plaintiff's successor, whom EEI hired in the spring of 2021 at a higher starting salary than Plaintiff's. *Id.*

A plaintiff may rely on comparator evidence to establish a pretext for discrimination. To do so, a plaintiff must "demonstrate that all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (cleaned up). As relevant here, "[f]actors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties" and whether they had the "same supervisor." *Id.* Plaintiff, however, provides the court with scant information to determine whether her additional comparators are "nearly identical" to her in "all of the relevant aspects." *Id.* She identifies the race and sex of Levey and Jura and cites exhibits establishing their salaries and the timing of their employment, but nothing more. *See* Pl.'s Opp'n at 32. She does not identify what Levey's and Jura's duties and responsibilities were, and Steckelberg testified that neither worked "in [Steckelberg's] group." Steckelberg Dep. at 57–58. As to Bury, Plaintiff adds that she had less experience as a Hill staffer than Plaintiff. Pl.'s Opp'n at 32. But Steckelberg's testimony is unrebutted that, by the time of Bury's hiring, EEI worked closely with the Department of Energy's national laboratories, and Bury's immediate prior position was as liaison for the Secretary of Energy to those labs. Steckelberg Dep. at 51. She possessed experience and expertise that Plaintiff did not. Simply put, Plaintiff has not demonstrated that Levey, Jura, or Bury are appropriate comparators.

10

As for Arness, though he is arguably an appropriate comparator, the court already has explained that Plaintiff has offered no evidence to support the inference that EEI's nondiscriminatory reason for offering him a higher starting salary was a pretext for sex discrimination. The same holds true for race discrimination.

### D.

Finally, the court addresses Defendant's motion for summary judgment on Plaintiff's claims that her race and sex were, at least, a motivating factor in her termination.[4] The court holds that Plaintiff may proceed on her discrimination claim on the basis of her race but not her sex.

### 1.

The burden-shifting principles that apply to a disparate-treatment claim are familiar. Once a complainant "establish[es] a *prima facie* case of prohibited discrimination . . . . the burden then shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment decision." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (internal citation omitted). EEI has met that burden here. *See, e.g.*, Def.'s SOF. ¶¶ 86–88, 93–94, 99. "[O]nce the employer asserts a legitimate, nondiscriminatory reason, the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (cleaned up). "The only question that remains is whether the evidence creates a material dispute on the ultimate issue." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016). A plaintiff may rely on three categories of evidence to create such a material dispute: "(1) the

---

[4] Plaintiff also asserts that her firing was retaliatory, but the court already has concluded that Plaintiff did not engage in protected opposition activity. The court holds, in addition, that Plaintiff cannot sustain such a claim because she has offered no evidence to support her argument that the stated reasons for her termination were a pretext for retaliation.

plaintiff[']s *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination . . . such as independent evidence of discriminatory statements or attitudes . . . of the employer." *Aka*, 156 F.3d at 1289. A plaintiff need not present evidence in each category to create a jury question and avoid summary judgment. *Id.* The court concludes for three reasons that Plaintiff has created a genuine issue on the ultimate question of whether she was terminated because of her race.

First, there is some basis to question EEI's proffered reason for Plaintiff's termination. On May 8, 2019, Steckelberg met with Franks and delivered a two-page performance memorandum dated May 3, 2019 ("May 3 Memo"). Def.'s SOF ¶ 96. That memorandum included a bullet-pointed list of tasks that Steckelberg expected Plaintiff to accomplish, including weekly status updates on her work. Pl.'s Opp'n, Ex. 34, Performance Memo, May 3, 2019, ECF No. 21-28, at 1–2 (stating, "I expect Jessica to . . ." and then listing objectives). It also stated that Steckelberg "plan[ned] to meet with Jessica around the 4th of July recess to evaluate her execution of these activities." *Id.* at 2. The parties differ about whether Plaintiff did or did not finish the tasks, Def.'s Reply to Pl.'s SOF, ECF No. 23 [hereinafter Def.'s Reply SOF], ¶¶ 93–94, but the court need not delve into that dispute. What matters is what Steckelberg conceded in her deposition. She admitted to never having provided feedback to Plaintiff after delivering the May 3 Memo, Steckelberg Dep. at 114; to not having met with her to review performance around July 4, as the memo indicated, *id.* at 139; and, critically, that Plaintiff would "[n]ot necessarily" have remained employed even if she had completed the May 3 Memo's tasks, *id.* at 123. Steckelberg admitted that not all of her expectations were even outlined in the May 3 Memo. *Id.* at 126. And, Steckelberg said that, by the time of the promised July 4 evaluation, she had already decided to fire Plaintiff, and that she would have liked to have terminated her employment even before issuing

the May 3 Memo. *Id.* at 139. Viewing Steckelberg's admissions in the light most favorable to Plaintiff, a reasonable jury could view EEI's issuance of the May 3 Memo not as a genuine evaluation of Plaintiff's performance but as a sham paper trail to justify Plaintiff's predetermined termination.

Second, some of the criticisms directed at Plaintiff's job performance are inherently subjective. The D.C. Circuit has directed that subjective considerations should be viewed with "caution, since employers can easily use such criteria to mask discrimination." *Carter v. George Washington Univ.*, 387 F.3d 872, 880 (D.C. Cir. 2004) (internal quotation marks omitted). Further, the Circuit has said that when an employer's proffered non-discriminatory justification "involves subjective criteria, the evidence must provide fair notice as to how the employer applied the standards to the employee's own circumstances. Failing to provide such detail—that is, offering a vague reason—is the equivalent of offering no reason at all." *Figueroa v. Pompeo*, 923 F.3d 1078, 1092 (D.C. Cir. 2019). Here, Steckelberg sometimes described Plaintiff's purported inadequacies in subjective terms: she lacked "leadership," "initiative," and "hustle." Def.'s SOF ¶ 87; Pl.'s Sealed Exs., Ex. 7, ECF No. 20-2, at 10 (EEI interrogatory response stating that "Ms. Franks did not meet EEI's performance expectations because she did not show to Kathy Steckelberg's satisfaction the leadership and initiative required of her in her role"). And, when Steckelberg delivered the news of Plaintiff's termination, Steckelberg told Plaintiff that she was "not a good fit." Def.'s SOF ¶ 102. EEI does little to explain how it measured "leadership," "initiative," and "hustle," or what criteria it used to determine an employee's "fit." A reasonable jury could view such subjective explanations with skepticism and thus as evidence of pretext.

Finally, the record contains language that reasonably could be viewed as "race-inflected code." *DeJesus*, 841 F.3d at 536. For instance, when hiring Plaintiff, Steckelberg described her

as "articulate" and a "good speaker."  Pl.'s Opp'n, Ex. 4, Franks Hiring Emails, ECF No. 21-4, at 8; Steckelberg Dep. at 35.  She also told Plaintiff she was "not a good fit" when delivering news of her firing.  Def.'s SOF ¶ 102.  The D.C. Circuit has said that these very words can reasonably be "interpreted as race-inflected code" and constitute "independent evidence of discriminatory statements or attitudes on the part of the employer."  *DeJesus*, 841 F.3d at 536 (internal quotation marks omitted) (stating that complimenting a Black employee for "speaking well" and describing two Black employees as "not a good fit" could be "interpreted as race-inflected code").

For the foregoing three reasons taken together, the court finds that Plaintiff has created a genuine dispute of fact as to whether race was a motivating factor in her termination.

## 2.

The court concludes otherwise, however, as to Plaintiff's sex discrimination claim.  No reasonable jury could conclude that sex was a motivating factor for her termination.

For one, Plaintiff was terminated by a female supervisor that hired her.  This "same-actor inference," though not dispositive, "is probative evidence against the claim that [Steckelberg] harbored a general animus against female employees."  *Czekalski v. Peters*, 475 F.3d 360, 368–69 (D.C. Cir. 2007).  Additionally, Plaintiff's replacement, Allison Bury, is a woman, further diminishing any inference of sex-based animus.  *See Murray v. Gilmore*, 406 F.3d 708, 715 (D.C Cir. 2005) (observing that "replacement within the same protected class cuts strongly against any inference of discrimination"); *Brown v. Brody*, 199 F.3d 446, 451 (D.C. Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (finding with respect to employee's non-selection for desirable transfer that district court "correctly observed that any sexual discrimination claim would be baseless because two of the three employees selected for that transfer were women").

14

Finally, although some of the pretext evidence cited above is arguably relevant, Plaintiff cites no comparable "independent evidence of discriminatory statements or attitudes on the part of the employer" with respect to her sex discrimination claim. *DeJesus*, 841 F.3d at 536 (internal quotation marks omitted). The lone hint of any such independent evidence that Plaintiff offers is her testimony that she once overheard Steckelberg say, "when working women get pregnant, it's hard on the companies to have to deal with their absence." Franks Dep. at 55. Yet, when asked during her deposition why she believed that "Kathy respects men more than she respects women," the only evidence Plaintiff cited was Steckelberg's purported comment about maternity leave. Franks Dep. at 90–91. No reasonable jury could conclude that Steckelberg's comment, without more, evinced a general hostility towards women. Plaintiff has failed to create a genuine dispute of material fact as to whether her sex was a reason for her termination.

## V.

Defendant's Motion for Summary Judgment, ECF No.16, is granted in part and denied in part. As to the hostile work environment claims, Counts I and IV, the motion is granted. As to the termination claims, Counts III and VI, the motion is granted with respect to sex discrimination and retaliation, but denied as to race discrimination. On the disparate pay and Equal Pay Act claims, Counts II, V, and VII, the motion is granted.

The parties shall appear for a remote videoconference on April 19, 2022, at 10:45 a.m. to discuss further proceedings in this matter.

Dated: March 31, 2022

Amit P. Mehta
United States District Court Judge